Jerold JACKSON and Virginia Jackson, Appellants--Plaintiffs,

v.

The BOARD OF COMMISSIONERS OF the COUNTY OF MONROE, Appellee--Defendant,

Vova Johnson, Robert John, Harry Breedlove and Charles Breedlove, Appellees--Third Party Plaintiffs.

No. 53A05--0901--CV--20.

Court of Appeals of Indiana.

Nov. 16, 2009.

Rehearing Denied Jan. 15, 2010.

Geoffrey M. Grodner, Kendra G. Gjerdingen, Stacy F. Thompson, Mallor Clendening Grodner & Bohrer LLP, Bloomington, IN, Attorneys for Appellants.

David B. Schilling, Monroe County Attorneys' Office, Bloomington, IN, for Appellee, Bd. Of Comm. of Monroe County.

## OPINION

MAY, Judge.

Jerold and Virginia Jackson appeal the trial court's determination that a road running through their property is a public road. We reverse.

### FACTS AND PROCEDURAL HISTORY

Moores Creek Road is a public road that ends near the northern shore of Lake Monroe. From the southern end of Moores Creek, a road known locally as Baxter Branch Road extends toward the northeast. Maps dating as early as 1897 show Baxter Branch extending from Moores Creek to State Road 446 or to other roads that connect with State Road 446. However, the eastern portion of the road has not been maintained and has fallen out of use.

For many years, the Pennington family owned land that was bounded on the west by Moores Creek, and Baxter Branch ran through their property near its southern border. In 1964, Gene Adams purchased the property just east of the Penningtons' property and built a campground on it. To the south of the campground is an open

field owned by the federal government. Baxter Branch runs through the campground property close to the border between the campground property and the government property.

Adams built a campground, store, and private residence on his property. The residence was located off of Baxter Branch near the western edge of the property. The campground had three camping areas, called (from west to east) hill one, hill two, and hill three. The store was located near hill three. In 1977, Adams sold his property to Ron and Kay St. Martin. The St. Martins continued to operate the campground, but they converted the store into a game room for their campers. In 2003, the St. Martins sold the property to the Jacksons, who are the current owners. The Jacksons built a new residence, which is located east of hill three.

For purposes of argument, the parties have divided the contested road into three segments: AB is the segment from Moores Creek to the western edge of the campground property, BC is the segment from the western edge of the campground property to the place where the store had been located, and CD is the segment from the store to the eastern edge of the campground property.[1]

Paul Pennington, who was seventy-six at the time of trial, had lived in the area longer than any other witness. When Pennington was growing up, Baxter Branch was a dirt road used by the Penningtons and some neighboring farmers. From the earliest time he could remember, there was one gate across the west end of

the road where it connected to Moores Creek, (at Point A), and a second gate on the eastern border of the Penningtons' property (which is Point B). Landowners to the east also had gates across the road. Pennington's father kept the gates closed at all times. The Penningtons permitted neighboring farmers to use the portion of the road located on their land. Anyone who used the road would open and shut the gates. These gates rotted away around the time Adams bought the campground.

When Adams built the campground, Pennington widened Segment AB, which is the portion on his property, and covered it with stone. Adams also made improvements to at least a portion of Segment BD, as it passed through the campground property.

On August 29, 1964, Adams prepared a document that read, "I do hereby give my consent for the road over and to Section 30 to be traveled by the public."[2] (Defendants' Ex. 10.) It was signed by Pennington.[3] When asked whether he intended by this to make the road a public road, Pennington responded, "I didn't stop nobody from going in, the road was there and, uh, at that time, it was no concern to me.... I didn't intend, at the time being, it didn't even enter my mind. It was there ... as long as I can remember and it didn't concern me one way or the other what became of it." (Tr. at 98) (errors in original).

At some point, a dirt pile was placed in the road near Point D at the eastern edge of the campground property. Pennington

1. When no segment is specified, this opinion should be understood to refer to the entire contested portion of Baxter Branch, from point A to point D.

2. The Pennington and campground properties are located in Section 30 of Salt Creek Township, Monroe County.

3. Pennington remembered giving oral permission to Adams for his campers to use the road. He did not recall signing the document, but did acknowledge that his signature appeared on it.

testified Adams paid him to place it there because Adams did not want people entering his property from the east. He also testified that Adams placed a gate across the road just to the east of his house, but he gave keys to certain people, including Pennington. The St. Martins testified the dirt pile and the gate were there when they purchased the property. The St. Martins later moved the gate to the west side of the house.

When the St. Martins bought the campground property in 1977, Pennington gave permission for them and their campers to use the portion of the road on his property, Segment AB. At the junction of Moores Creek and Baxter Branch, the St. Martins posted a sign that said, "Private Lane, Keep Out, campers, guests, and residents only." (*Id.* at 37.) In 1986, the St. Martins obtained a formal written easement over Segment AB. Pennington began subdividing his property and sold several lots along Segment AB. In 1994, after he sold the lots, he sold a fifty-foot wide strip containing Segment AB to the St. Martins.

Ron St. Martin testified he believed the road was a private road because Pennington considered it a private road. Kay St. Martin testified Adams told them it was a private road and he stopped people from using it. Pennington had paid taxes on the property where Segment AB was located, as did the St. Martins after Pennington sold it to them. The St. Martins maintained Segment AB after they purchased it. The adjoining property owners held easements over Segment AB and contributed to the cost of its maintenance. The St. Martins placed their mailbox on Moores Creek because they regarded Baxter Branch as a private road.

At first the St. Martins kept the gate locked, but it became an annoyance because too many campers would forget their keys. In later years, the St. Martins kept the gate closed only during the week and all winter.

Ron claimed the dirt pile near Point D was three feet high and blocked access to Baxter Branch from the east. Kay also testified no one ever accessed the road from the east. As of 1977, Segment CD appeared to have not been traveled in years, because there were trees and brush growing up in it. Ron testified Segment CD was impassable during the years he owned the campground property. From 1980 to 2002, the St. Martins allowed Ray Blair, one of their campers, to park a pontoon boat just east of hill three, blocking Segment CD from the west. Blair testified the area behind his boat was full of briars and trees, and no road was visible. Several witnesses testified that anyone who wanted to travel eastward beyond the boat had to drive south from Point C to the federal property.

The St. Martins allowed campers, the Army Corps of Engineers, the Department of Natural Resources, and neighboring landowners, including the Penningtons and the Breedloves, to use the road. The St. Martins would eject anyone they found using the road who they did not believe had any business using it. They testified that no one used the road without their permission.

The Jacksons began renting a campsite in 1990, and they purchased the campground property, including Segment AB, from the St. Martins in 2003. After they purchased the property, the Jacksons kept the gate closed at night and during the winter. Jerold maintained and patrolled the road. If Jerold found people on the road who did not have his permission to be there, he would tell them they were not allowed to use the road.

The Jacksons did not know the roadway continued beyond hill three, except

through the government property. Pennington showed the Jacksons where the road had been located, and in 2004, he helped them open up Segment CD to facilitate building a new house. They had to put in four loads of stone to raise the level of the road because it was very marshy. Pennington described the condition of Segment CD as follows:

> There was trees, small, I call them bushes. There was trees within this size right here, small ones, briars, and thick. Also, it was swampy where the water came down a holler. And, it was, it was real swampy.... And, it was thickly briared, you could not have walked up it, no way, shape, or form until I opened it up.

(*Id.* at 106) (errors in original).

Gene Adams had a different recollection of the use of the road. He did not remember asking Pennington to put a dirt pile in the road, and he denied placing a gate across the road. Adams testified he never prevented anyone from using the road, and he wanted it to be open to the public because his store was open to anybody, not just campers. Adams testified the public used the road "[a]ll the time," (*id.* at 214), and would come from both the east and the west. He stated:

> On Sundays it's just like watching a parade because you didn't know which way they was coming. People was coming and what they was going to be driving, whether it was going to be a motorcycles, or horses and wagons, etc. You know, I could, I don't have the names all here with me or anything, but it was dozens and dozens and dozens of people from the late '60's to '77 that used that road and, and the facilities there that I put in.

(*Id.* at 202) (errors in original). Adams claimed the roadway east of hill three, i.e. Segment CD, was rough, but passable, when he sold the campground property to the St. Martins.

The Breedlove family once owned a large tract of land in the area, but most of it was sold to the federal government for the creation of Lake Monroe. The remaining property is landlocked, but the Breedloves did not retain an express easement. Historically, the Breedloves have accessed their property by using Segment AC Baxter Branch, then veering off onto the government property, and then using an easement over property owned by the Penningtons. However, at least one of the Breedloves claimed to have used Segment CD instead of veering off onto government property. Harry Breedlove testified the dirt pile was small enough that his truck or jeep was able to drive over it. Harry said Adams kept Segment CD cleared, and Harry would also clear brush and trees out of the road if necessary. Segment CD was "not impassable if you've got the right vehicle." (*Id.* at 309.) The St. Martins gave him a key to the gate and did not object to the Breedloves using the road.

For many years, no one complained about the gate, the boat, or the dirt pile. The St. Martins received no complaints about their efforts to keep the public from using the road. No question was raised about the road's status until the Breedloves became concerned about access to their property.

The Breedloves wanted to sell their land, and therefore approached the Army Corps of Engineers about obtaining a formal easement. David Cable, who is the Lake Manager for Lake Monroe, had some familiarity with Baxter Branch, because he used it several times during the 1990s to access the federal property and inspect its border. Cable claimed he was able to see "an obvious road bed" behind the boat, i.e., over Segment CD. (*Id.* at 249.) However, since his purpose was to access the federal

land, he would simply turn off of Baxter Branch at that point. Cable was not sure whether Baxter Branch was a public or private road, and the Army Corps of Engineers would not grant an easement over its property if the Breedloves could access their property via Baxter Branch.[4] Therefore, Cable asked the Monroe County Board of Commissioners to determine the status of Baxter Branch.

The Commissioners noted Baxter Branch appeared on maps dated as early as 1897 and took the position that it was a public road. The Commissioners sent the Jacksons a letter claiming the road was a public road and demanded they remove any obstructions to the road.

The Jacksons filed a complaint against the Commissioners, seeking a declaratory judgment that Baxter Branch is a private road. The Commissioners filed a counterclaim, seeking a declaratory judgment that Baxter Branch is a public road.[5]

On December 18, 2008, the trial court entered judgment for the Commissioners. The trial court found all three segments were established as a public road, because the public had used them for at least twenty years by the early 1960s. The court determined any obstruction of Segment CD was a nuisance and did not defeat the public's right to use the road. The trial court also found Pennington dedicated Segment AB to the public by signing the 1964 document giving permission for the public to use the road and that Adams dedicated Segment BC to the public.

## DISCUSSION AND DECISION

■ Where, as here, the trial court makes findings of fact and conclusions of law pursuant to Ind. Trial Rule 52, we apply a two-tiered standard of review: whether the evidence supports and findings and whether the findings support the judgment. *Bowyer v. Ind. Dep't of Natural Res.*, 882 N.E.2d 754, 761 (Ind.Ct.App. 2008).

> The trial court's findings and conclusions will be set aside only if they are clearly erroneous, that is, if the record contains no facts or inferences supporting them. A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. We neither reweigh the evidence nor assess the credibility of witnesses, but consider only the evidence most favorable to the judgment. We review conclusions of law de novo.

*Id.* (citations omitted).[6]

We restate the issues as: (1) whether the trial court's conclusion that Baxter

---

4. Cable testified that if Baxter Branch was a private road, the Army Corps of Engineers would consider giving the Breedloves a license to use the federal property to access their property. He also testified the Breedloves could have vehicle access to their property via Pate Hollow, which runs through Forest Service property.

5. Several members of the Breedlove family were permitted to intervene. None of them has filed a brief on appeal.

6. The judge that conducted the trial died before issuing a final judgment. The parties agreed that the new judge would review the tapes of the trial instead of conducting a new trial. After the judge listened to the tapes, he held a hearing at which the parties presented argument. At that hearing, he informed the parties that the tapes had been recorded on a high speed, and everyone sounded "like the three chipmunks." (Argument Tr. at 2.) The Jacksons cite the usual standard for reviewing a trial court's findings of fact and conclusions of law, but in a footnote they suggest we need not defer to the trial court's findings because the trial court did not observe the witnesses or hear them testify in their normal voices. However, they do not develop this argument; therefore, we will apply the usual standard of review.

Branch became a public road by public use is clearly erroneous; and (2) whether the trial court's conclusion that Segments AB and BC were dedicated to the public is clearly erroneous.

### 1. *Public Use*

Ind.Code § 8–20–1–15 previously provided that a road could become a public highway if used as such for twenty years or more. That portion of the statute was removed when it was amended in 1988; however, "we may still hold that the public accepted a street by usage if the street was used as a public street for twenty years prior to 1988." *Chaja v. Smith,* 755 N.E.2d 611, 614 (Ind.Ct.App.2001), *reh'g denied, trans. denied.* "If the street became a public street before 1988, then the public has a vested right in that street, and the vested right was not eliminated by the amendment of the statute." *Id.* Under this statute, use "is the sole test, though frequency of use or the number or users is unimportant. It is enough if it is free and common to all who have occasion to use it as a public highway." *AmRhein v. Eden,* 779 N.E.2d 1197, 1207 (Ind.Ct.App.2002) (quoting *Cozy Home Realty Co. v. Ralston,* 214 Ind. 149, 151, 14 N.E.2d 917, 918 (Ind. 1938)).

The trial court concluded each segment of Baxter Branch became a public road by public use by the early 1960s, around the time the campground opened. In support of this conclusion, the court relied on the road's existence on various maps and Pennington's testimony. The road does appear on several maps, including one dated 1897. However, these maps are not plats[7] or some other type of official document that purports to show which roads are public and which are private. The Jacksons do not dispute that Baxter Branch has existed, in some form or another, for many years. The road's appearance on various maps, by itself, shows only that it existed, not that the public used the road.

The trial court found Pennington testified the public used the road from at least the 1930s to the early 1960s. This finding is not supported by the record. Pennington testified only that a few neighboring farmers used the road during that timeframe. A road does not become a public road simply because the owner selectively permits a few members of the public to use it. *See* Ind.Code § 9–13–2–49 (defining "private road" as "a way or place in private ownership that is used for vehicular travel by the owner and those having express or implied permission from the owner but not by other persons").[8] Public use means the road is "free and common to all who have occasion to use it as a public highway," *AmRhein,* 779 N.E.2d at 1207, not just certain members of the public who have received permission to use it. As there was no evidence the public used the road before the campground opened in 1964, judgment must be for the Jacksons, as parties asserting the existence of a public road bear the burden of proof. *See Columbia Realty Corp. v.*

---

**7.** Plaintiff's Exhibit SS and Defendant's Exhibit 13 are both copies of the letter Cable sent to the Commissioners. Attached to the letter are several maps, including three with handwritten labels indicating that they are plat maps of Salt Creek Township from 1957, 1973, and 1983. We have reviewed these maps, and they do not show a road running through the northern portion of Section 30, where the Pennington and campground properties are located. Therefore, to the extent the trial court relied on these maps, its findings were clearly erroneous.

**8.** Previously codified at Ind.Code § 9–4–1–14 and at Ind.Code § 47–1814 under the prior numbering system. First added by Acts of 1939, ch. 48, § 14.

*Harrelson,* 155 Ind.App. 604, 615, 293 N.E.2d 804, 810 (1973). The trial court's determination that Baxter Branch was a public road by 1964 is clearly erroneous.

 We must therefore consider whether the road became a public road at a later time. Adams' testimony would support finding that the public freely used the road during the years that he owned the campground property, 1964 to 1977, but that is less than twenty years. After the St. Martins purchased the campground property, they took steps to stop the public from using the road: they put up signs, kept a gate across the roadway, obstructed the road with a dirt pile and a pontoon boat, and ejected anyone they found using the road without their permission.

 "When the use of a highway is interrupted by the use of gates or bars, which evidences the intention of the owner to exclude the public from its uninterrupted use, the prescriptive right is destroyed, and the right must begin again to run from the date that the interruption is abated...." *Michigan Cent. R. Co. v. Michigan City,* 94 Ind.App. 481, 490, 169 N.E. 873, 877 (1930). There was no evidence that people other than neighbors, campers, and government officials used the road after 1977. These were all people the St. Martins gave permission to use the road. Pennington owned Segment AB until 1994, and he did not testify that he actively took any steps to prevent people from using the road; however, he acquiesced in the St. Martins' efforts to keep the public from using the road. As there is no evidence the public used the road for twenty years, the Commissioners did not prove it became a public road by public use. *See Zakutansky v. Kanzler,* 634 N.E.2d 75, 81 (Ind.Ct.App.1994) (road does not become public if the public is "actually and physically excluded").

### 2. Dedication

 The trial court also found Segments AB and BC were dedicated to the public. "There are two essential elements of a common-law dedication[:] (1) the intent of the owner to dedicate and (2) the acceptance by the public of the dedication." *Gibson v. Ocker,* 138 Ind.App. 438, 441, 214 N.E.2d 395, 397 (1966). Dedication may be express or implied. *Schultz v. Keel,* 122 Ind.App. 471, 478–79, 106 N.E.2d 254, 257 (1952). "An implied dedication is one arising by operation of law from the acts of the owner." *Town of Poseyville v. Gatewood,* 65 Ind.App. 50, 52, 114 N.E. 483, 484 (1916). "The intention must clearly appear, and the acts and declarations of the owner relied on to establish it must be clear, convincing, and unequivocal." *Id.* In determining the owner's intent, we look to his open acts, not his secret intent. *Id.* Public use "for a long time" is sufficient to demonstrate acceptance by the public. *Cook v. Rosebank Development Corp.,* 176 Ind.App. 664, 671, 376 N.E.2d 1196, 1201 (1978). The burden of proof is on the party asserting a dedication. *See Steinaur v. City of Tell City,* 146 Ind. 490, 499, 45 N.E. 1056, 1059 (1897) (lack of proof as to the owner's intent construed against the party alleging dedication); *Town of Marion v. Skillman,* 127 Ind. 130, 138, 26 N.E. 676, 678 (1891) (lack of proof as to how long hotel had occupied a portion of alleged public road construed against party claiming the road had been dedicated).

 The trial court found Pennington expressly dedicated Segment AB in 1964 when he signed the document stating, "I do hereby give my consent for the road over and to Section 30 to be traveled by the public." (Defendants' Ex. 10.) Express dedication typically involves a deed, a plat, or some other document specifically using the word "dedication." *See, e.g.,*

*Gibson,* 138 Ind.App. at 439, 214 N.E.2d at 396 (alley appearing on a subdivision plat); *Smith v. State,* 217 Ind. 643, 646, 29 N.E.2d 786, 787 (1940) (document titled "Dedication of North Meridian Street to the State of Indiana and Agreement"); *Michigan City v. Szczepanek,* 85 Ind.App. 227, 229, 150 N.E. 374, 375 (1926) (land deeded to the county board of commissioners for "a public highway to be located thereon").

██ The document Pennington signed did not mention dedication, only consent. This is an important distinction, because a dedication may not be revoked after public acceptance, *Steinaur,* 146 Ind. at 498, 45 N.E. at 1059, whereas a landowner could withdraw consent. Therefore, the document Pennington signed was not a dedication, and we must consider whether, in light of all his actions, he manifested a clear intent to dedicate Segment AB.

Although Pennington did not actively keep people from using the road, that is insufficient to establish dedication. *See Pennsylvania Co. v. Plotz,* 125 Ind. 26, 32, 24 N.E. 343, 344 (Ind.1890) (holding that when a landowner opens a way for his own convenience, mere acquiescence to public use does not constitute dedication). Moreover, Pennington took several actions inconsistent with dedication. From 1977 to 1994, he allowed the St. Martins to place signs at the beginning of the road indicating it was private, and he acquiesced in their efforts to keep the public off the road. Pennington told people the road was private, granted easements over it, and eventually sold it. Pennington maintained and improved the road, and he paid taxes on it. Therefore, the Commissioners did not establish Pennington intended to dedicate Segment AB.

██ The trial court also found Adams dedicated Segment BC. Adams' testimony that the public freely used the road and he wanted the public to do so because of his store would support this finding. However, this testimony would also support finding Segment CD was dedicated to the public, yet the trial court did not so find. We do not think it necessary to determine whether Adams dedicated one or both of them to the public. A road remains public even if it is rarely used, is open on only one end, or goes to only one property. *Fenley Farms, Inc. v. Clark,* 404 N.E.2d 1164, 1170 (Ind.Ct.App.1980). However, because Segment AB is not a public road, the remainder of the road is inaccessible to the public. Segments BC and CD are located entirely on one property and are not open on either end. No purpose can be served by finding Adams dedicated one or both of them to the public. Such a holding would serve only to upset the expectations of the Jacksons, who are the record title holders of this property and had no indication from other public records that the road may be a public road. Therefore, we conclude the entire disputed portion of Baxter Branch is a private road.[9]

Reversed.

CRONE, J., and BROWN, J., concur.

---

9. Given this holding, we find it unnecessary to address the Jacksons' argument that the Commissioners did not prove Baxter Branch is a public road because the current roadway is wider and not in the same location as the historic road.